

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**ENTERED**
**04/29/2015**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| Amerejuve, Inc. | § | Case No. 14-35482 |
| | § | |
| Debtor. | § | Chapter 11 |
| | § | |

**MEMORANDUM OPINION ON MORTEZA NAGHAVI'S: (1) MOTION TO MODIFY OR AMEND FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING ORDER DIRECTING APPOINTMENT OF A CHAPTER 11 TRUSTEE; AND (2) MOTION TO MODIFY OR AMEND THE ORDER DIRECTING APPOINTMENT OF A CHAPTER 11 TRUSTEE**
[Refers to Docket Numbers 82 and 83]

## I. INTRODUCTION

Three creditors filed an involuntary Chapter 11 petition against Amerejuve, Inc. (the Debtor), a privately-held company in Houston. In response, the president and majority shareholder of the Debtor, Morteza Naghavi (Naghavi), authorized the filing of a voluntary Chapter 11 petition. After Naghavi took this action, the parties that filed the involuntary petition filed a motion to appoint a trustee under § 1104 of the Bankruptcy Code.[1] The Court held a hearing on this motion, and then made oral findings of fact and conclusions of law and orally granted the relief sought; thereafter, an order granting the motion was docketed; and since then, the trustee has been in control of the Debtor's assets and operations.

Naghavi now returns to this Court with: (1) a Motion to Modify or Amend Findings of Fact and Conclusions of Law Regarding Order Directing Appointment of a Chapter 11 Trustee,

---

[1] Any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code, unless otherwise noted.

[Doc. No. 82]; and (2) a Motion to Modify or Amend the Order Directing Appointment of a Chapter 11 Trustee, [Doc. No. 83] (hereinafter, these two motions are collectively referred to as the Motion). Naghavi contends that this Court erred in finding that he embezzled funds of the Debtor and wants this Court to amend its findings and conclusions to delete this finding.

There is no question that this Court made an oral finding that Naghavi embezzled money from the Debtor, and that this was one basis, among others, for this Court's entry of an order granting the motion to appoint a trustee. The Court now issues this Memorandum Opinion for these reasons: (1) to set forth written findings of fact and conclusions of law to memorialize the Court's oral findings and conclusions made at the close of the hearing held on the motion to appoint a trustee;[2] and (2) to set forth why it will deny the Motion and adhere to its initial finding that Naghavi embezzled funds of the Debtor.

In his pending pleadings, Naghavi seems to be requesting only that this Court remove its findings and conclusions regarding embezzlement—thereby suggesting that Naghavi does not challenge this Court's findings and conclusions regarding the alternative grounds which this Court cited to appoint a trustee. Stated differently, his pleadings suggest that Naghavi does not challenge the appointment of a trustee on the non-embezzlement ground that this Court cited, and therefore accepts the appointment of a trustee. However, in other portions of the Motion, and in paragraph 11 of his reply to the responses opposing the Motion, [Doc. No. 100], Naghavi seems to argue that this Court's findings and conclusions are insufficient to justify the appointment of a trustee *on any grounds*. Naghavi seems to request that this Court vacate, in its

---

[2] To the extent that this Court's written findings and conclusions conflict with the Court's oral findings and conclusions, the former shall govern. To the extent that this Court's written findings and conclusions do not encompass all of this Court's oral findings and conclusions, the latter shall supplement the former.

entirety, its order granting the motion to appoint a trustee;[3] or, alternatively, he seems to be suggesting that the Court should enter an order under § 1105 terminating the trustee at this juncture and restoring Naghavi, plus a designated chief restructuring officer, to now take over control of the Debtor. Out of an abundance of caution, the Court will assume that Naghavi is in fact requesting that this Court either entirely vacate its order granting the motion to appoint a trustee or, alternatively, amend its findings and conclusions to delete any reference to embezzlement, and then enter a new order under § 1105 terminating the trustee and restoring Naghavi as president of the Debtor.

For the reasons set forth below, this Court: (1) holds that its original ruling that Naghavi committed embezzlement is correct, and therefore declines to amend its findings and conclusions to delete the finding that Naghavi committed embezzlement; (2) holds that, even if the Court is incorrect about Naghavi having committed embezzlement, it should not vacate its order appointing a trustee because the Court articulated other valid grounds, that provided the basis for the appointment of a trustee; and (3) declines to terminate the trustee and reinstate Naghavi under § 1105.

## II. FINDINGS OF FACT

### A. Factual Background of Naghavi

1. Naghavi is the president of the Debtor. [H'rg Tr. 30:1–3, Nov. 13, 2014].

---

[3] At the hearing on the Motion which this Court held on February 17, 2015, this Court asked Naghavi's counsel whether Naghavi is requesting this Court to vacate the order. Naghavi's attorney did not initially respond to this inquiry; then he answered in the affirmative; and then he equivocated and seemed to suggest that the appointment of a trustee is acceptable so long as it is not based on findings and conclusions that Naghavi committed embezzlement ("I think we need to do it without the backdrop to the criminal aspects or the embezzlement aspects of the failure to pay the 941 taxes because I think that's just wrong. And I think that in fairness you should correct it."). [H'rg Tr. 9:2–19, Feb. 17, 2015].

2. Naghavi owns approximately 95% of the stock of the Debtor. [H'rg Tr. 131:8–18, Nov. 13, 2014]. When Naghavi founded the company, he was the 100% shareholder. [H'rg Tr. 30:20–24, Nov. 13, 2014]. However, several other individuals now own, collectively, 5% of the Debtor's stock. [H'rg Tr. 131:11–18, Nov. 13, 2014].

3. Naghavi resides at 5203 Fieldwood Drive, Houston, Texas 77056. His residence is located in the very toney neighborhood known as "Tanglewood". [H'rg Tr. 30:9–16, Nov. 13, 2014].

4. Naghavi pays approximately $35,000–$40,000 per year in property taxes on his Tanglewood residence. [H'rg Tr. 56:5–9; 73:4–7, Nov. 13, 2014].

5. Naghavi's monthly mortgage payment on his Tanglewood residence is $4,200. [H'rg Tr. 73:8–9, Nov. 13, 2014].

6. Naghavi's 2012 tax return reflects itemized deductions of approximately $63,000 and itemized Schedule C expenses of approximately $65,350, with $25,000 of these expenses being for Naghavi's several consultants and contractors. [H'rg Tr. 76:2–16, Nov. 13, 2014].

7. Prior to the filing of the involuntary petition, Naghavi controlled several entities other than the Debtor, including American Heart Technologies (AHT), MEDITEX IN3 Ventures (MEDITEX), Fairway Medical Technologies (Fairway), and Endothelix. [H'rg Tr. 33:1–37:12, Nov. 13, 2014]. None of these entities, except Endothelix, have ever had any business operations. [H'rg Tr. 39:1–7, Nov. 13, 2014]; [H'rg Tr. 29:3–7, Nov. 14, 2014].

8. According to Naghavi, both he and AHT extended loans to the Debtor. [H'rg Tr. 81:5–11, Nov. 13, 2014]; [H'rg Tr. 19:10–20, Nov. 14, 2014].

**B. Factual Background of the Debtor**

9. The Debtor was founded in 2007. [H'rg Tr. 30:20–21, Nov. 13, 2014].

10. The Debtor is in the so-called "Med Spa" business. [H'rg Tr. 106:6–15, Nov. 13, 2014]. The Debtor's business includes laser hair removal services, noninvasive body contouring such as cold sculpting, laser treatment and skin rejuvenation, and cosmetic surgeries. [H'rg Tr. 107:21–108:3, Nov. 13, 2014]. The Debtor has nine locations in the greater Houston area. [H'rg Tr. 31:11–14, Nov. 13, 2014]. This business also includes selling products to the customers who receive treatment. [H'rg Tr. 18:6–9, Nov. 14, 2014].

11. For some reason not explained to this Court, all individuals who actually worked at the spa locations owned by the Debtor were listed as employees of Fairway—not of the Debtor—despite the fact that all of these employees had contracts with the Debtor, not Fairway. Indeed, Fairway had no business operations separate and distinct from those of the Debtor. The only activity performed at Fairway was to process payroll for the individuals who provided services at the spas owned by the Debtor. And, Fairway obtained the funds to make payroll from the Debtor. [H'rg Tr. 27:22–29:2, Nov. 14, 2014]. Indeed, the employee ID number that was used when any payroll tax payments were made was the Debtor's number. [H'rg Tr. 45:20–25, Nov. 14, 2014].

12. The Debtor has approximately 50 employees. [H'rg Tr. 84:1–4; 106:11–15, Nov. 13, 2014].

13. According to Naghavi's testimony, the Debtor had total revenue in 2013 of $7,151,340. [H'rg Tr. 62:14–16, Nov. 13, 2014].

14. According to Naghavi's testimony, the Debtor had positive net income in 2011, 2012, and 2013, with ordinary income in 2013 totaling $485,200. [H'rg Tr. 64:7–15, Nov. 13, 2014].

## C. Naghavi's Control Over the Debtor's Funds

15. Prior to the filing of the Debtor's bankruptcy petition, Naghavi was the sole signatory on the Debtor's bank account. [H'rg Tr. 105:8–19, Nov. 13, 2014]; [Hr'g Tr. 26:3–14, Nov. 14, 2014].

16. No person working for the Debtor has ever had the right to issue a check or make a payment without first obtaining Naghavi's approval. [H'rg Tr. 17:17–20, Nov. 14, 2014].

## D. Naghavi's Tight Leash on the Debtor's Chief Financial Officer and Chief Operating Officer

17. Vincent Chitolie (Chitolie) was the Chief Financial Officer (CFO) and Chief Operating Officer (COO) of the Debtor between February of 2013 and September of 2014. [H'rg Tr. 23:6–21, Nov. 14, 2014].

18. Despite serving as CFO and COO, Chitolie had no authority to make any payments on behalf of the Debtor. In his words: "Everything had to be cleared through Dr. Naghavi." [H'rg Tr. 26:3–6, Nov. 14, 2014].

19. Naghavi had complete control over all payments made by the Debtor, including even the most routine obligations. For example, Chitolie could not process checks or ACH transfers to pay the Debtor's rent or utility bills without first obtaining Naghavi's approval; indeed, it was Naghavi, not Chitolie, who signed the checks. [H'rg Tr. 33:23–34:10, Nov. 14, 2014].

20. The Debtor had an account at Chase Bank, and it was possible to make electronic transfers from this account, but, in Chitolie's words: "I could schedule a transfer, but

everything had to be approved and done by Dr. Naghavi." [H'rg Tr. 26:13–14, Nov. 14, 2014].

### E. Information About Payroll Taxes that Chitolie Provided to Naghavi

21. Chitolie made Naghavi aware of each of the Debtor's payroll periods, and what the payroll obligation was for each period. [H'rg Tr. 26:15–18, Nov. 14, 2014]. Chitolie believed that "the taxes should be paid every time that [they] became due because we had meetings with the IRS," [H'rg Tr. 67:13–14, Nov. 14, 2014], but Naghavi did not take this approach. [H'rg Tr. 17:5–16, Nov. 14, 2014].

22. Indeed, Chitolie provided Naghavi specific information which identified the gross income for each employee and what amount needed to be withheld as the tax obligation and the separate obligation for social security (FICA) taxes. [H'rg Tr. 26:24–27:4, Nov. 14, 2014].

### F. Naghavi's Transfers of the Debtor's Monies

23. From time to time, Naghavi moved monies out of the Debtor's operating account to the MEDITEX account, the AHT account, and his personal account. [H'rg Tr. 35:21–36:1; 78:1–3, Nov. 13, 2014].

24. Naghavi admitted that the Debtor transferred funds to AHT to repay a portion of the loan that AHT allegedly made to the Debtor, but Naghavi could not recall the exact amount of the repayment. [H'rg Tr. 20:2–6, Nov. 14, 2014].

25. Naghavi deliberately kept the minority shareholders in the dark about the transactions whereby transfers were made from the Debtor's account to accounts of other entities controlled by Naghavi. [H'rg Tr. 60:18–25, Nov. 14, 2014].

**G. The Debtor's Poor Accounting Practices**

26. The Debtor had no accountants working for it. [H'rg Tr. 56:4–8, Nov. 14, 2014].

27. The Debtor's books and records were not properly kept in accordance with generally accepted accounting principles, and there were payments constantly being made to entities owned by Naghavi. There was never a reconciliation of the Debtor's general ledger account. [H'rg Tr. 54:1–56:3, Nov. 14, 2014].

**H. The Debtor's Failure to Pay Taxes**

28. The Debtor fell behind in making payroll taxes by more than $500,000.00. [H'rg Tr. 49:2–4, Nov. 14, 2014]. Indeed, the Debtor made no payroll tax payments in November and December 2013, [H'rg Tr. 45:9–13, Nov. 14, 2014], and for the period from January through September 2014, only some payments were made in January, February, and March, but no payments were made thereafter. [H'rg Tr. 45:20–46:5, Nov. 14, 2014].

29. Between April 1, 2014 and September of 2014, the Debtor failed to make any payroll tax payments. [H'rg Tr. 32:15–18; 46:1–5, Nov. 14, 2014]. There is no question that Naghavi was aware of these tax obligations. [H'rg Tr. 32:19–24; 33:20–22, Nov. 14, 2014].

30. During this 6-month period, there were two pay periods each month—on the 7th day and the 22nd day—and the payroll for each of these pay periods was approximately $105,000. [H'rg Tr. 32:25–33:19, Nov. 14, 2014].

**I. Naghavi's Knowledge of the Debtor's Tax Obligations and Delinquency**

31. There is no question that Naghavi understands what payroll taxes are. [H'rg Tr. 43:3–44:8, Nov. 13, 2014]. Further, there is no question that Naghavi understands that the funds that are withheld from an employee's paycheck do not belong to the Debtor but

rather should be paid directly to the IRS. [H'rg Tr. 44:4–9, Nov. 13, 2014]. Indeed, Naghavi understands that if the withheld monies are not paid to the IRS, then this situation potentially "constitutes stealing." [H'rg Tr. 44:10–12, Nov. 13, 2014].

32. Naghavi admits that the Debtor fell behind in paying its payroll taxes in the second and third quarters of 2014. [H'rg Tr. 87:25–88:4; 90:13–16, Nov. 13, 2014].

33. Naghavi understands that the rules regarding payroll taxes apply to the Debtor. Indeed, he testified that "rules are rules." [H'rg Tr. 16:18, Nov. 14, 2014].

34. Naghavi understands that every time the Debtor pays employees, the Debtor has a payroll tax liability that it must simultaneously pay to the IRS. [H'rg Tr. 17:8–15, Nov. 14, 2014].

**J.  Communications Between the IRS and Naghavi**

35. In February of 2014, Naghavi met with the IRS to discuss the past due payroll taxes owed by the Debtor and his personal obligation to pay the payroll taxes that the Debtor had failed to pay. [Hr'g Tr. 12:14–24; 27:3–28:8; 29:8–11, Nov. 14, 2014]. This meeting took place at the IRS office on Southwest Freeway in Houston, and Naghavi was accompanied by his personal attorney, James Mahan, and by Chitolie. [H'rg Tr. 12:25–13:10; 27:5–14, Nov. 14, 2014].

36. After Naghavi met with the IRS in February of 2014, the Debtor made a few payments of payroll taxes, but not all that were required to be made. [H'rg Tr. 32:11–14, Nov. 14, 2014].

37. On July 11, 2014, the IRS sent a letter to Naghavi making a claim against him personally for nonpayment of payroll taxes. This letter set forth that the amount of past due payroll

taxes was $539,629.94, and that the amount of penalties totaled $379,131.88. [H'rg Tr. 40:7–41:20, Nov. 13, 2014].

## III. CONCLUSIONS OF LAW

### A. Jurisdiction

This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1334(a) and (b), and § 157(a). This dispute is a core proceeding under 28 U.S.C. § 157(b)(2)(A) because the request to appoint a receiver, if granted, certainly affects the administration of the bankruptcy estate: the estate will be administered by an independent third party, not the debtor-in-possession. This dispute is also a core proceeding under 28 U.S.C. § 157(b)(2)(O) because the request to appoint a receiver, if granted, affects the debtor-creditor relationship, as the creditors will be looking to an independent third party, not the entity with whom they originally dealt, for payment of their claims. Finally, this dispute is core under the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.)*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."). Whether a trustee should be appointed to take over the administration of a bankruptcy estate can only arise in the context of a bankruptcy case.

### B. Venue

Venue is proper under 28 U.S.C. § 1408(1).

### C. Constitutional Authority to Enter a Final Order

Having concluded that this Court has jurisdiction over this matter, this Court nevertheless notes that *Stern v. Marshall*, 131 S.Ct. 2594 (2011), sets forth certain limitations on the constitutional authority of bankruptcy courts to enter final orders. Therefore, this Court has a

duty to inquire into its constitutional authority to enter a final order for any matter brought before this Court.

The Court concludes that it does indeed have the constitutional authority to enter a final order in this dispute. The Court arrives at this conclusion because the facts in *Stern* are entirely distinguishable from those in the case at bar. In *Stern,* the debtor's counterclaim was based solely on state law; there was no Code provision undergirding the claims being litigated. *Id.* at 2611. Moreover, the resolution of the estate's counterclaim was not necessary to adjudicating the validity or invalidity of the claim of the creditor. *Id.* Under these circumstances, the Supreme Court held that the bankruptcy court lacked constitutional authority to enter a final judgment on the debtor's counterclaim. *Id.* at 2620.

In the case at bar, the dispute is based solely on an express Code provision: § 1104(a). State law has no equivalent to this statute; it is purely a creature of the Code. Accordingly, because the resolution of this matter is based on solely bankruptcy law, not state law, there is no *Stern* concern, and this Court has the constitutional authority to enter a final order appointing a trustee.

### D. Section 1104 Governs the Creditors' Motion to Appoint a Trustee, and This Provision Expressly Sets Forth Various Grounds for Appointing a Trustee.

Section 1104, in pertinent part, sets forth that:

> At any time after the commencement of the case . . . the court shall order the appointment of a trustee—(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause. . . .

The parties moving to appoint a trustee bear the burden, by clear and convincing evidence, of demonstrating that cause exists for the appointment of a trustee. *Matter of Cajun Elec. Power Coop., Inc.*, 69 F.3d 746, 749 (5th Cir. 1995), *withdrawn in part on other grounds,*

11

74 F.3d 599 (5th Cir. 1996); *In re Bayou Group, LLC*, 564 F.3d 541, 546 (2d Cir. 2009); *In Re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989); *In Re ATP Oil & Gas Corp.*, No. 12-36187, 2013 WL 9792582, at *9 (Bankr. S.D. Tex. 2013). In the case at bar, this Court concludes, for the reasons set forth below, that the creditors who filed the motion to appoint a trustee have satisfied their burden and shown that there are three separate and distinct grounds under § 1104 to justify appointment of a trustee.

### 1. *Naghavi Committed Fraud by Embezzling Substantial Sums of Money From the Debtor Prior to the Filing of the Involuntary Petition Against the Debtor.*

#### a. The definition of "embezzlement" under 11 U.S.C. § 523(a)(4) can be used to establish embezzlement by Naghavi so as to justify the appointment of a trustee under 11 U.S.C. § 1104.

Embezzlement is a form of fraud. In bankruptcy cases, embezzlement typically comes into play when a creditor files a complaint under § 523(a)(4) to prevent the discharge of the specific debt owed to that creditor. *See, e.g., In re Miller*, 156 F.3d 598, 602–03 (5th Cir. 1998) (discussing whether the misappropriation or misuse of proprietary information and trade secrets may constitute embezzlement as it relates to the § 523(a)(4) exception to discharge); *In re Davenport*, 353 B.R. 150, 200–02 (Bankr. S.D. Tex. 2006). Indeed, § 523(a)(4) expressly states, in pertinent part, that a debt for "embezzlement" may not be discharged. In cases concerning § 523(a)(4) complaints, the Fifth Circuit has defined "embezzlement" as "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Miller*, 156 F.3d at 602 (quoting *Greyhound Lines Inc. v. Thurston*, 18 B.R. 545, 550 (Bankr. M.D. Ga. 1982)). This Court sees no reason why the Fifth Circuit's definition of "embezzlement" in the § 523 context cannot apply to § 1104 with respect to determining whether fraud has occurred. Accordingly, creditors seeking appointment of a trustee based upon a showing of embezzlement, must satisfy the following elements: (1) that a person in

current management came into the funds lawfully; (2) that the person into whose hands the funds came lawfully used these monies for purposes other than those for which they were designated; and (3) the person's actual use of these funds was fraudulent.

In the case at bar, the facts reflect that Naghavi embezzled substantial funds belonging to the Debtor or, more precisely, the IRS. First, Naghavi was in a key management position, as he was the president of the Debtor, [Finding of Fact No. 1]; and he had total control over all payments made by the Debtor, including payments for routine obligations such as utility bills. [Findings of Fact Nos. 15, 16, 18, 19 & 20]. Moreover, Naghavi was the sole signatory on the Debtor's bank account, [Finding of Fact No. 15]; therefore, he—and only he—could sign checks and electronically transfer funds on deposit in the Debtor's account. [*See* Findings of Fact Nos. 15, 16, 18, 19 & 20]. Thus, all funds that were deposited into the Debtor's account were funds over which Naghavi had legal control. The first element of embezzlement is therefore satisfied.

Second, Naghavi appropriated funds on deposit in the Debtor's account for a purpose other than that for which these funds were entrusted. Specifically, the Debtor withheld funds from the paychecks of its employees, [Findings of Fact Nos. 21 & 28−30], and Naghavi, as president of the Debtor, was entrusted with these funds to ensure that they were paid to the IRS as payroll taxes. [*See* Findings of Fact Nos. 21, 22 & 34]. Yet, Naghavi did not pay all of these entrusted funds to the IRS; rather, he diverted the funds to his own personal account and to the accounts of AHT and MEDITEX, two other entities he controlled. [Findings of Fact Nos. 7, 23−24]. Under these circumstances, this Court concludes that the second element of embezzlement is satisfied.

The next issue is whether the third element of embezzlement is satisfied: Did Naghavi appropriate the funds with *fraudulent intent*? Because it is rare that anyone will affirmatively

admit to having fraudulent intent—and Naghavi has certainly not so conceded—the law allows fraudulent intent to be proved by circumstantial evidence. *In Re Brady*, 101 F.3d 1165, 1173 (6th Cir. 1996); *In Re Buhay*, 77 B.R. 561, 565 (Bankr. W.D. Tex. 1987) (citing *United States v. Powell*, 413 F.2d 1037, 1038 (4th Cir. 1969)); *see also Roberts v. United States*, 151 F.2d 664, 665 (5th Cir. 1945). In *Pool v. Johnson*, 2002 WL 598447 (N.D. Tex. Apr. 15, 2002), the District Court affirmed the bankruptcy court's four-part test for determining fraudulent intent: (1) whether the person alone has access to the funds; (2) whether the person had knowledge that the creditor wanted the funds; (3) whether the person had accounted to the creditor for the funds that had been taken; and (4) whether an accounting had ever been made for the funds.

Applying this objective test to Naghavi's actions, the conclusion is inescapable that Naghavi acted with fraudulent intent. First, Naghavi alone had access to the funds deposited in the Debtor's account; he—and only he—had check-signing authority and fund-transferring authority. [Findings of Fact Nos. 15, 16, 18 & 19]. Second, Naghavi had knowledge that the creditor—i.e., the IRS—wanted the funds that Naghavi had misappropriated (i.e., the payroll taxes) returned to the IRS. [Findings of Fact Nos. 35 & 37]. Indeed, not only did the IRS send a demand letter to Naghavi, [Finding of Fact No. 37], the IRS also had a face-to-face meeting with Naghavi that left no doubt that the IRS wanted payment of the payroll taxes. [Finding of Fact No. 35]. Hence, the first two elements articulated in *Pool* are easily satisfied.

The Court finds that the third element is also met. Naghavi—when he was in charge of the Debtor—never accounted to the IRS for the funds that he misappropriated. [*See* Findings of Fact Nos. 24, 25, 27 & 28]. The Court also finds that the fourth element is met. Naghavi has never provided the IRS, this Court, the minority shareholders of the Debtor, or the employees of the Debtor whose payroll taxes he did not pay, with a complete and accurate accounting of

14

exactly how he spent the funds that he misappropriated. [Findings of Fact Nos. 24–27]. In conclusion, all four elements articulated in *Pool* have been satisfied, and this Court therefore finds that Naghavi appropriated the funds with fraudulent intent.

Aside from the four-part *Pool* test, fraudulent intent may be inferred from the totality of the circumstances. *Matter of Reed*, 700 F.2d 986, 991 (5th Cir. 1983) (The debtor's "whole pattern of conduct" supports the bankruptcy court's finding of fraudulent intent); *Farmers Co-op. Ass'n v. Strunk*, 671 F.2d 391, 395 (10th Cir. 1982) ("Fraudulent intent of course may be established by circumstantial evidence, or by inferences drawn from a course of conduct."); *Matter of Yonikus*, 974 F.2d 901, 904 (7th Cir. 1992) ("The bankruptcy court's finding of fraudulent intent may be based on inferences drawn from a course of conduct . . . [or] from all of the surrounding circumstances."). In the case at bar, as further evidence of Naghavi's fraudulent intent, there is the strict leash on which Naghavi kept the Debtor's CFO, Chitolie. [*See* Findings of Fact Nos. 15, 16 & 18–20]. How many CFOs are there in this country who do *not* have check-signing authority on the company's operating account? How many CFOs are there in this country who must obtain permission from the company's president (by obtaining his signature on the check) to pay even the most mundane expense (such as a utility bill)? The fact that Naghavi had complete control over the corporate checkbook—never allowing Chitolie or anyone else to make any payment on his own—speaks volumes to this Court about Naghavi's fraudulent intent. Naghavi essentially created a CFO and COO position for Chitolie as a ruse to camouflage Naghavi's pilfering of the Debtor's operating account at will. Indeed, the fact that during Naghavi's presidency, the Debtor had no accountants working to keep its books and records in compliance with generally accepted accounting principles, [Findings of Fact Nos. 26 & 27], underscores Naghavi's fraudulent intent.

Additional evidence of Naghavi's fraudulent intent lies in his orchestrating transfers of monies from the Debtor's account to AHT and MEDITEX. [Findings of Fact Nos. 23 & 24]. Neither of these entities, both of which are controlled by Naghavi, have any business operations. [Finding of Fact No. 7]. It is not as if these two entities had operations which were affiliated with the Debtor's operations and could help the Debtor generate additional revenues. Rather, these two entities were simply shell entities that Naghavi used to tunnel monies out of the Debtor's account for his own benefit.

There is more. Further evidence of Naghavi's fraudulent intent is the "shell game" he orchestrated with respect to employees. He saw to it that the individuals who worked at the spa locations owned by the Debtor were listed as employees of Fairway—not of the Debtor—despite the fact that all these employees had contracts with the Debtor, not Fairway. [Finding of Fact No. 11]. Indeed, Fairway had no business operations separate and distinct from those of the Debtor. [*Id.*]. The only activity performed at Fairway was to make payroll for the individuals who provided services at the spas owned by the Debtor. [*Id.*]. And, Fairway obtained the funds to make payroll by receiving funds from the Debtor. [*Id.*]. Indeed, the employee ID number that was used when any payroll tax payments were made was the Debtor's number. [*Id.*]. This Court can only conclude that Naghavi orchestrated this scheme to camouflage his intent to siphon off funds from the Debtor's operating account.

And, it should be noted that Naghavi's transfer of funds out of the Debtor's account was not in the "nickel and dime" category. Just the contrary! The IRS sent him a demand letter setting forth that he is personally liable for unpaid payroll taxes in the amount of $539,629.94, plus $379,131.88. [Finding of Fact No. 37]. Naghavi's lavish lifestyle reflects where he was using the monies he siphoned off from the Debtor. While the Debtor's employees were going to

work every day assuming—incorrectly—that their payroll taxes were being paid, Naghavi was using the funds he transferred from the Debtor's account to pay for his extraordinarily high monthly mortgage of $4,200 and his extraordinarily large taxes on his residence of $40,000. [Findings of Fact Nos. 3–5 & 23]. Living a life of luxury in the Tanglewood neighborhood is most definitely a basis for establishing Naghavi's fraudulent intent.

In sum, in the case at bar, this Court finds that Naghavi appropriated the Debtor's funds with fraudulent intent. Not only is the four-part test of *Pool* satisfied, but the totality of the circumstances reflect Naghavi's fraudulent intent. Under all of the circumstances described above, this Court concludes that Naghavi committed embezzlement.[4] And, because he did so, this Court further concludes that fraud occurred such that under § 1104, this Court needed to appoint a trustee. Indeed, the language of § 1104 requires the appointment of a trustee when fraud is proven.

> b. There is at least one Fifth Circuit case with a fact pattern similar to the case at bar where the "responsible person" was held to have committed embezzlement.

An analysis of whether someone is a "responsible person" typically arises in the context of 26 U.S.C. § 6672, which is entitled "[f]ailure to collect and pay over taxes, or attempt to evade or defeat tax." The Fifth Circuit directs trial courts to determine whether an individual is a "responsible person" "by looking to one's status within a corporation—that is, one's duty and authority to withhold and pay taxes"; and the Fifth Circuit instructs that "[t]he crucial inquiry is whether the person has the 'effective power' to pay the taxes—that is, whether he had the actual

---

[4] The Court notes that the elements that needed to be proved to establish embezzlement under Texas law substantially track with the elements already discussed herein. *See, e.g., Smith v. State of Texas*, 468 S.W.2d 828, 829 (Tex. Crim. App. 1971) ("A conviction for embezzlement will be sustained where defendant was intrusted with money or property to be disposed of in a particular way and the proof shows that he did not do that and defendant fails to show [an] honest disposition thereof."). Thus, if the Court were applying Texas law, it would still reach the conclusion that based upon the record in this case, Naghavi committed embezzlement.

17

authority or ability, in view of his status within the corporation, to pay the taxes owed." *Barnett v. I.R.S.*, 988 F.2d 1449, 1454 (5th Cir. 1993). The Fifth Circuit issued an opinion in 1992, with facts similar to those in the case at bar, that supports this Court's conclusion that Naghavi committed embezzlement.

In *Raba v. United States*, 977 F.2d 941 (5th Cir. 1992), a Mr. Mirelez served as a bookkeeper for a business named CRP. Mirelez had significant control over this entity's financial dealings, sufficiently so that the district court found that he was a "responsible person" who became personally liable for payroll taxes that the business failed to remit to the IRS. *Id.* at 943. The district court also found that Mirelez misappropriated funds from the business by changing the name of the payee on two checks from CRP to himself, and then depositing the funds from these checks into his own account rather than paying them over to the IRS. *See id.* at 942. The district court found that these actions constituted embezzlement and entered a judgment against him for the amount of the misappropriated funds. *Id.* The Fifth Circuit affirmed the district court's ruling. *Id.* at 941.

In the case at bar, Naghavi's actions are quite similar to those of Mirelez. Granted, Naghavi did not change the name of the payee on any checks from the Debtor's name to his own name. But, he took actions that are just as egregious. He transferred funds from the Debtor's account—that should have been remitted to the IRS—to the accounts of other entities which he controlled, [Findings of Fact Nos. 7, 23 & 24]; or he simply wrote checks from the Debtor's account and deposited them into the accounts of these other entities and into his own personal account. [Findings of Fact Nos. 7, 23 & 24]. These actions are virtually the same as the actions of Mirelez in *Raba*. This Court sees no reason why *Raba*'s holding that Mirelez committed embezzlement does not apply to Naghavi's actions in the case at bar. Naghavi, like Mirelez, was

18

the "responsible person" for ensuring that payroll taxes of the Debtor's employees were paid to the IRS, and Naghavi, like Mirelez, misappropriated substantial funds for his own benefit that should have been paid to the IRS. How else could Naghavi afford to pay his large, monthly mortgage payment of $4,200, the extraordinarily high annual property taxes of $40,000 on his homestead in Tanglewood, and $25,000 to consultants and contractors? [*See* Findings of Fact Nos. 3–6].

In sum, if *Raba* is not a "white horse" case, it is at least a "gray mule." Naghavi, like Mirelez, committed embezzlement, and because Naghavi did so, this Court concludes that fraud occurred and that therefore, under § 1104, this Court was required to appoint a trustee.

### 2. Even if Naghavi Did Not "Embezzle" Funds from the Debtor, Naghavi's Actions Nonetheless Constitute "Dishonesty" Under 11 U.S.C. § 1104(a)(1).

Even assuming that Naghavi's actions do not constitute "embezzlement," they nevertheless constitute "dishonesty" under 11 U.S.C. § 1104(a)(1), and therefore "cause" exists to appoint a trustee. Although there is no Fifth Circuit case law that defines "dishonesty" for purposes of § 1104, courts across the country recognize that "dishonesty" under § 1104 may encompass a variety of actions. *See, e.g., Comm. of Dalkon Shield Claimants v. A.H. Robins Co.*, 828 F.2d 239, 243 (4th Cir. 1987) ("[T]he concepts of incompetence and dishonesty cover a wide spectrum of conduct . . . [i]mplicit in a finding of incompetence, dishonesty, etc., for purposes of section 1104(a)(1) . . . ."); *In re Deena Packaging Indus., Inc.*, 29 B.R. 705, 707 (Bankr. S.D.N.Y. 1983) (concluding that the debtor's failure to list all assets and liabilities in its original and amended petitions constituted "dishonest conduct for the purposes of section 1104(a)(1)"); *In re Euro-American Lodging Corp.*, 365 B.R. 421, 426 (Bankr. S.D.N.Y. 2007) ("Dishonesty provides a reason to appoint a chapter 11 trustee under § 1104(a)(1)."). The definitions used by these courts track with Merriam-Webster's definition of "dishonesty" as "lack of honesty or

integrity: disposition to defraud or deceive." "Dishonesty." Merriam-Webster Online Dictionary. 2015. http://www.merriam-webster.com (28 Apr. 2015).

In the case at bar, Naghavi, as president and 95% shareholder of the Debtor and as a "responsible person," had a duty to ensure that all payroll taxes of the Debtor's employees were timely paid to the IRS. He failed miserably to do so. [*See* Findings of Fact Nos. 28–34]. Rather, Naghavi wrongfully moved monies, with which he was entrusted, out of the Debtor's operating account to the MEDITEX account, the AHT account, and his personal account, [Findings of Fact Nos. 23 & 24]—no doubt to help him pay his annual property taxes of $40,000 on his homestead, his monthly mortgage payment of $4,200, and fees of $25,000 for consultants and contractors. [Findings of Fact Nos. 4–6]. Naghavi also deliberately kept minority shareholders in the dark about the transfers made from the Debtor's account to the accounts of other entities which he controlled. [Finding of Fact No. 25]. Naghavi took these surreptitious actions despite knowing that: (1) withholding monies from payroll taxes which are not paid to the IRS could potentially "constitute stealing," [Finding of Fact No. 31]; (2) the Debtor was behind in paying its employment taxes in the second and third quarters of 2014, [Finding of Fact No. 32]; (3) the rules regarding payroll taxes apply to the Debtor, [Finding of Fact No. 33]; and (4) every time the Debtor pays employees, the Debtor incurs a payroll tax liability which must be paid to the IRS simultaneously with the payment of the employees themselves, [Finding of Fact No. 34].

Under all these circumstances, the Court concludes that Naghavi's actions constitute dishonesty under § 1104 and, because of this dishonesty, cause exists under § 1104 to appoint a trustee.

### 3. *Naghavi, as a "Responsible Person," Failed to Ensure that the Debtor Paid Payroll Taxes to the IRS Even Though He Had the Duty to Do So; and His Failure Constitutes Incompetence or Gross Mismanagement of the Debtor.*

Assuming Naghavi neither "embezzled" funds from the Debtor nor engaged in "dishonest" conduct, this Court nevertheless still finds "cause" under § 1104 to appoint a trustee because Naghavi was the responsible person in charge of ensuring that the Debtor's taxes were timely paid to the IRS. This Court sees no reason why the Fifth Circuit's interpretation of "responsible person" in the § 6672 context cannot apply to § 1104 with respect to determining whether incompetence or gross mismanagement has occurred.

As detailed above, there is clear and convincing evidence that Naghavi is a "responsible person" as defined by the Fifth Circuit: he was the president and 95% stockholder of the Debtor with sole check-signing authority and the sole power to approve all payments made by the Debtor. [Findings of Fact Nos. 1, 2, 15, 16, 18, 19 & 20]; *see Brown v. U.S.*, 591 F.2d 1136, 1138–39 (5th Cir. 1979) (holding that president who signed all payroll checks and vice president who was authorized to sign corporate checks were "responsible officers" liable for § 6672 penalties).

And, as discussed above, pursuant to § 6672, Naghavi had a duty to ensure that the Debtor timely paid its payroll taxes. Moreover, it is clear that Naghavi: (1) understood what payroll taxes are, [Finding of Fact No. 31]; (2) understood that withheld funds from an employee's paycheck should have been paid to the IRS, [Findings of Fact Nos. 31 & 34]; (3) was aware of the Debtor's payroll tax obligations, [Findings of Fact Nos. 21 & 22]; and (4) was aware that withholding monies from employee paychecks from the IRS could potentially "constitute stealing," [Finding of Fact No. 31]. Despite knowing all the above, Naghavi failed to fulfill his fundamental duty of ensuring that the Debtor timely pay its payroll taxes. And, he

failed to meet this duty despite the fact that the Debtor—by Naghavi's own testimony—was generating revenue in 2013 in excess of $7 million and positive net income 2011, 2012, and 2013, with ordinary income of 2013 totaling $485,200. [Findings of Fact Nos. 13 & 14]. Stated differently, the Debtor had the wherewithal to timely pay all of these taxes.

To the extent that the Debtor failed to pay its payroll taxes due to poor bookkeeping and record-keeping, Naghavi, as president of the Debtor, never bothered to retain an accountant for the Debtor, and never ensured that the Debtor's books and records were kept pursuant to generally accepted accounting principles. [Findings of Fact Nos. 26 & 27]. Indeed, he failed to retain an accountant for the Debtor even after issues with the IRS emerged—a responsibility that is unquestionably the duty of the president of a corporation.

Under the above described circumstances, this Court finds that Naghavi, while president of the Debtor, committed gross mismanagement. This Court is by no means the first court to hold that a corporation's failure to pay taxes constitutes gross mismanagement within the meaning of § 1104. *See In re Euro-American Lodging Corp.*, 365 B.R. at 426 (holding that the debtor was "guilty of 'gross mismanagement' within the meaning of § 1104(a)(1) . . . [and] '[g]ross mismanagement' includes the chronic failure to pay taxes, particularly where the failure leads to liability for interest and penalties."). Alternatively, even if these circumstances do not constitute "gross mismanagement," they constitute incompetence on Naghavi's part.

The Court wants to emphasize that its findings that Naghavi's conduct constitutes "gross mismanagement" and "incompetence" do not require a finding of any fraudulent or dishonest conduct by Naghavi—even though this Court believes (as already discussed above) that Naghavi *has* committed embezzlement and *has* been dishonest. Rather, the mere failure by Naghavi to

ensure that the Debtor failed to pay its payroll taxes—particularly in the hundreds of thousands

of dollars—is sufficient to constitute "gross mismanagement" or "incompetence."

In sum, the Court finds that Naghavi's conduct, because it rises to the level of "gross

mismanagement" or "incompetence," constitutes "cause" under § 1104(a)(1); therefore, pursuant

to this section, the Court must appoint a trustee.

### E. To the Extent that the Motion Requests this Court, Pursuant to Section 1105, to Enter a New Order Terminating the Trustee and Restoring Naghavi to His Position as President of the Debtor (as Debtor-in-Possession), this Court Declines to Grant this Relief.

Section 1105 sets forth that:

> At any time before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court may terminate the trustee's appointment and restore the debtor to possession and management of the property of the estate and of the operation of the debtor's business.

Here, Naghavi has not filed a motion requesting this Court to take such action under this

particular provision. The express language of the statute requires a "notice and hearing," and

because Naghavi has filed no such motion, this Court would violate due process if it now

terminated the trustee's appointment and restored Naghavi to his position as president of the

Debtor. *See Huddleston v. Nelson Bunker Hunt Trust Estate,* 109 B.R. 197, 201 (N.D. Tex.

1989), *aff'd,* 935 F.2d 1290 (5th Cir. 1991) (per curiam) ("Due process in the bankruptcy context

requires that individual notice be given before rights can be affected.").  Indeed, at the hearing on

the Motion, counsel for the trustee expressly argued that, to the extent that the Motion requests

relief under § 1105, this Court should not grant relief under this section because Naghavi has

never filed a motion under this provision expressly requesting this relief. [H'rg Tr. 12:15, 21–22;

13:1–4, Feb. 17, 2015]. This Court entirely agrees.

In the alternative, even if this Court held that all parties in interest had sufficient notice that the Motion requested relief under § 1105, this Court would nevertheless refuse to terminate the trustee and reinstate Naghavi.

This Court has the discretion to determine whether to terminate the trustee's appointment. *In re Clinton Centrifuge, Inc.*, 85 B.R. 980, 984 (Bankr. E.D. Pa. 1988) ("This viewpoint [that the court has broad discretion] is supported by 11 U.S.C. § 1105 which gives the bankruptcy court 'uncircumscribed power to terminate' the trustee's appointment."); *In re General Oil Distributors, Inc.*, 42 B.R. 402, 409 (Bankr. E.D.N.Y. 1984) (recognizing "the [bankruptcy] court's uncircumscribed power to terminate the appointment of a trustee under § 1105"); *In re Van Upp*, 2010 WL 2901634, at *1 (Bankr. N.D. Cal. July 19, 2010) ("Section 1105 of the Bankruptcy Code leaves it to the discretion of the bankruptcy court whether to terminate the appointment of a chapter 11 trustee and restore the debtor to possession and management of the bankruptcy estate.").

In evaluating whether a trustee's appointment should be terminated, this Court may consider the following factors: (1) new evidence, *see In re Taub*, 441 B.R. 211, 215 (Bankr. E.D.N.Y. 2010) ("A court may consider new evidence and determine that the appointment of a trustee was 'improvidently' made."); (2) a change in conditions, *see In re Curlew Valley Associates*, 14 B.R. 506, 514–15 (Bankr. D. Utah 1981) ("Section 1105 'permits the court to terminate the appointment of a trustee where conditions have changed subsequent to the court's order of appointment and the continued service by a trustee is not in the interest of creditors, equity security holders, and other interests of the estate."); and (3) circumstances that eliminate the reason for the trustee's appointment, *see Taub*, 441 B.R. at 215–16 ("[T]erminating a

trustee's appointment pursuant to Section 1105 is a 'rare' occurrence which may be occasioned by the existence of 'circumstances . . . that eliminate the reason for the trustee's appointment.").

In the case at bar, at the hearing on the Motion, Naghavi introduced no new evidence at all—nor did his counsel argue that conditions have changed—to justify terminating the trustee's appointment. Indeed, since assuming her role as trustee, Elizabeth Guffy has done stellar work that has provided much benefit to the estate. For example, she has: (1) engaged in the settlement of disputes related to complaints made by the Debtor's customers, [Doc. Nos. 95 & 101]; (2) retained a financial consultant to assist in marketing and auctioning the Debtor's assets, [Doc. Nos. 113 & 122]; (3) rejected leases on eight vehicles which reduced the accrual of administrative rent expenses, [Doc. Nos. 123 & 162]; and (4) conducted an auction for the sale of certain assets of the Debtor which will bring in over $820,000 to the estate, [Doc. No. 247]. Her actions underscore that this Court not only should *not* terminate the trustee, but rather should applaud her efforts to date. This, the Court now does.

In sum, for all of the reasons set forth above, this Court declines to terminate the trustee's appointment and restore Naghavi to his position as president of the company as a debtor-in-possession. Rather, this Court stands by its initial ruling granting the motion to appoint a trustee, and finds that there *is no reason whatsoever to terminate her appointment.*

## IV. CONCLUSION

Sir Walter Scott's maxim applies to Naghavi: "O, what a tangled web we weave when first we practise to deceive!"[5] Here, Naghavi deceived his fellow shareholders, the IRS, and the Debtor's employees by using his powers as president of the Debtor to line his own pockets instead of ensuring that all of the Debtor's payroll taxes were timely paid to the IRS. Now,

---

[5] Sir Walter Scott, *Marmion, Canto vi. Stanza 17.* The Court notes that the word "practise" is not misspelled in this quotation.

having been caught, Naghavi himself must pay the piper—both in dollars and in loss of reputation.

Alternatively, even if Naghavi did not commit embezzlement and was not dishonest, he exhibited gross mismanagement or incompetence—or both—in failing to ensure that the Debtor paid its payroll taxes. Even under these circumstances, he must still pay the piper—both in dollars and in loss of reputation.

The Court denies all relief requested by Naghavi, expressly or impliedly, in the Motion. An order consistent with this Memorandum Opinion will be entered simultaneously on the docket.

Signed on this 29th day of April, 2015

Jeff Bohm
Chief United States Bankruptcy Judge